Filed 3/10/22  P. v. St. Amie CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B308633 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BA110927) |
| HERMAN ST. AMIE et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County.  Lisa B. Lench, Judge.  Affirmed.

Pensanti & Associates and Louisa Pensanti for Defendant and Appellant Herman St. Amie.

The Justice Firm and Joseph Virgilio for Defendant and Appellant Kenyon Pitts.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant Ronald Cains.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant Marcell Cloud.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez, Charles J. Sarosy, Idan Ivri, and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 1996, defendants and appellants Herman St. Amie (St. Amie), Kenyon Pitts (Pitts), Ronald Cains (Cains), and Marcell Cloud (Cloud) were convicted by a jury of first degree murder (Pen. Code, § 187, subd. (a)),[1] finding true the robbery-murder and kidnapping murder special circumstance allegations (§ 190.2, subds. (a)(17)(A) & (B)). They were sentenced to life in state prison without the possibility of parole.

In 2019, each defendant filed a petition for resentencing pursuant to section 1170.95. Over the People's opposition, the trial court found that defendants had established a prima facie case for relief, issued an order to show cause, and held an evidentiary hearing pursuant to section 1170.95, subdivision (d).

After the evidentiary hearing, at which no party introduced new evidence, the trial court denied defendants' petitions. Defendants each timely filed a notice of appeal.

We affirm the trial court's orders.

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

# FACTUAL BACKGROUND

"On the evening of February 21, 1995, Robert Davis [Davis] drove to the Hawthorne home of 'Damont' to discuss the purchase of a 'boom box.' [Cepeus Sudduth (Sudduth), defendants], Wadrick Bouligny [(Bouligny)] and others were present in the area near Damont's home. Davis obtained the 'boom box' from Damont and left the area to test it. When he returned later in the evening to purchase the item [defendants, Sudduth,] and Bouligny were still in the area.

"After paying Damont, Davis approached the yard where Sudduth, Cains, Cloud and St. Amie stood. Pitts and Bouligny were in Pitts's Chevrolet which was parked nearby. Sudduth pulled out a knife or screwdriver, placed it against Davis's abdomen and ordered him to empty his pockets. After obtaining $300 from Davis, Sudduth repeatedly demanded more money. Cloud held Davis as a pillowcase was placed over his head. Then he was beaten by several people, receiving blows to his head and abdomen until he agreed to give his assailants anything they wanted.

"Cains and St. Amie dragged Davis, whose head was still covered by the pillowcase, across the street and placed him in the back seat of his Datsun. St. Amie and Sudduth also entered the car. Cains and Cloud entered Pitts's Chevrolet, where Bouligny was already seated, and told Pitts to follow the Datsun. When Pitts asked why, Cloud stated they were following the Datsun so that 'he [Davis] could get his money.'" (*People v. Cloud* (Jan. 21, 1999, B109271) [nonpub. opn.], at pp. 3–4.)

The two cars proceeded to a house where Davis once lived. "St. Amie parked the Datsun in the alley behind the house while Pitts parked the Chevrolet nearby. Cloud and Cains left the

3

Chevrolet and joined Sudduth, St. Amie and Davis in the alley." (*People v. Cloud*, *supra*, B109271, at p. 4.) When the assailants learned that Davis did not have money at this location, Davis indicated that his girlfriend lived in Inglewood and that they could go to her house and see if she had any money. (*Id*. at p. 5.) "The pillowcase was again placed over Davis's head, he was placed in the front seat of the Datsun and the two cars proceeded to" Sonja Spencer's (Spencer) house, where she "lived with her four children, three of whom were fathered by Davis." (*Ibid*.)

"Davis, Sudduth and St. Amie approached Spencer's residence while Cains and Cloud stood in the driveway and Pitts remained in the Chevrolet." (*People v. Cloud*, *supra*, B109271, at p. 5.) While Spencer's daughter was getting Spencer, Sudduth and Davis searched for money in Spencer's bedroom. When Spencer saw what was happening, Sudduth forced her onto her knees with her hands behind her head and ordered her to be quiet. "At Sudduth's direction, Cloud obtained a knife from the kitchen and handed it to him. Sudduth held the knife to Spencer's throat." (*Ibid*.) "Cains stood guard at the door to the back bedroom to prevent any of Spencer's children from escaping through the window." (*Ibid*.)

"As the search continued, Davis was also forced down onto the living room floor next to Spencer. Davis was kicked and hit, and fell." (*People v. Cloud*, *supra*, B109271, at p. 6.) Spencer and Davis were repeatedly threatened. (*Ibid*.)

"Davis then suggested they go to his mother's Lancaster home where he claimed there were a couple of thousand dollars." (*People v. Cloud*, *supra*, B109271, at p. 6.) Before leaving Spencer's residence, Sudduth asked Davis at gunpoint whether the children were his. When Davis stated they were, "Sudduth

4

ordered him to get seven-month-old Jainah, intending to take her with them. Spencer, who was extremely frightened, got the baby, wrapped her in a blanket, prepared a bottle for her and gave her to Davis. The men told Spencer they would kill Davis and the baby if they did not get money. They also told her that if she called the police they would return to the house and kill her and the other children." (*People v. Cloud*, *supra*, B109271, at p. 6.)

"Outside of the residence, Davis and the baby, Sudduth and St. Amie entered the Datsun, while Cloud and Cains joined Pitts and Bouligny in the Chevrolet. The two cars proceeded to a nearby gas station where Pitts purchased gasoline for the Chevrolet. Sudduth and Cloud stated they were going to Lancaster to get money and that they were keeping the baby as security until they got it." (*People v. Cloud*, *supra*, B109271, at p. 6.)

"The two cars then proceeded to Lancaster where they stopped behind a bowling alley. Everyone except Pitts and Bouligny got out of the cars and discussed what they would do when they reached the home of Davis's mother. They agreed that some of them would enter the home while others remained outside and that the baby, Jainah, would be kept in the Chevrolet as security against anyone calling the police. Cloud stated the baby would be returned when [Sudduth and defendants] got the money." (*People v. Cloud*, *supra*, B109271, at p. 6.)

"The baby was placed unrestrained on the back seat of the Chevrolet and the cars proceeded to the home of Davis's mother." (*People v. Cloud*, *supra*, B109271, at p. 6.) Davis's sister saw the men approaching the home and called 911; as he entered the home, Sudduth ordered her to get off the telephone. (*Id*. at p. 7.)

5

"At a little after midnight, Los Angeles County Sheriff's units responded to [the] emergency call. Deputies Bower and Roth drove past [the] house in an unmarked vehicle and saw the Datsun parked in front. They also saw the Chevrolet parked nearby with several Black males inside. Deputy Bower noted that some of the men in the Chevrolet ducked as the police car passed.

"The unmarked unit joined marked patrol units . . . and Deputy Bower related her observations to her fellow deputies. Meanwhile, Cloud had ordered Pitts to follow the unmarked unit. As they passed [the] deputies' location, the occupants of the Chevrolet stared at the officers in surprise. Pitts panicked and turned into the opposite lane of traffic, causing the Chevrolet to hit the center divider and stop." (*People v. Cloud*, *supra*, B109271, at p. 7.)

"Pulling in behind the Chevrolet, the officers ordered the occupants to raise their hands and the driver to get out of the car. Pitts emerged from the car and walked back toward the officers as Cloud and St. Amie ordered him to get back in and drive. Suddenly, Pitts turned and jumped back in the driver's seat. He drove over the center divider into a traffic lane as Cloud and St. Amie yelled from the back seat, "'Drive. Drive. Drive.'" The Chevrolet sped off with the baby lying unsecured on the seat between Cloud and St. Amie." (*People v. Cloud*, *supra*, B109271, at p. 8.)

Sudduth and Cains were still in Davis's mother's home when they heard officers order their companions to "'freeze.'" (*People v. Cloud*, *supra*, B109271, at p. 8.) Sudduth and Cains ran out the front door. (*Ibid.*)

6

"Meanwhile, the occupants of the Chevrolet engaged the officers in a high speed chase, reaching speeds of 70 to 80 miles per hour on city streets, through stop signs and traffic lights until they left Lancaster, when their speed increased to 100 to 120 miles per hour. When they turned the headlights off, the police units backed off as the area was very dark with no artificial lighting. The Chevrolet continued, weaving from side to side of the road with its headlights on only intermittently until it hit a dip in the road, went airborne for a long distance and crashed." (*People v. Cloud*, *supra*, B109271, at p. 8.) Jainah "died as a result of the traumatic internal injuries to her chest, abdomen and head which were sustained in the crash." (*Ibid.*)

Defendants appealed, and on January 21, 1999, we modified part of the sentence but otherwise affirmed the judgments. (*People v. Cloud*, *supra*, B109271, at p. 34.)

## PROCEDURAL BACKGROUND

I. *Petitions for Habeas Corpus*

Subsequent to our Supreme Court's decisions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), Cloud, St. Amie, and Pitts filed habeas corpus petitions challenging their robbery and kidnapping special circumstance findings. On July 18, 2017, the trial court applied the factors set out in *Banks* and *Clark* to each defendant's participation in the crimes. It then denied the petitions.

II. *Section 1170.95 Petitions*

In 2019, each defendant filed a petition to be resentenced pursuant to section 1170.95. They averred that because they had been convicted of murder under either a felony murder theory or the natural and probable consequences doctrine, they were entitled to resentencing relief.

7

III. *The People's Opposition*

The People filed multiple oppositions to the petitions. The People argued, inter alia, that the special circumstance findings rendered defendants ineligible for relief and that defendants would still be convicted of first degree murder under current law because they were major participants in the underlying crimes of robbery and kidnapping who acted with reckless indifference to human life.

IV. *Hearing on Defendants' Petitions and Trial Court Order*

On July 27, 2020, the trial court held a hearing to determine whether to issue an order to show cause. After entertaining oral argument, it determined that defendants had made a prima facie case for relief and issued the order to show cause.

At a hearing on September 14, 2020, the prosecution and each defendant informed the trial court that they planned to rely on the existing record at the evidentiary hearing. No party planned to introduce new evidence.

The evidentiary hearing was held on September 29, 2020. Counsel for each defendant argued why the factual record in this case demonstrated that the section 1170.95 petitions should be granted. The trial court commented that it was "very familiar with the facts" and that it had "spent an inordinate amount of time on this case and dissecting each and every participant's role and conduct in this case."

On October 1, 2020, the trial court issued a written order denying defendants' petitions. In so ruling, the trial court noted that no new evidence was presented at the evidentiary hearing and that the facts set forth in our prior opinion "have not been disputed for purposes of the instant petitions." It then

8

summarized the facts from *People v. Cloud* and, in separate subsections, discussed the role that each defendant played in the underlying felonies leading up to the murder.

The trial court then explained its reasons for denying defendants' petitions. First, it found that the jury's special circumstance findings rendered defendants ineligible for relief, even though those findings were made before *Banks* and *Clark*. It noted that it had addressed *Banks* and *Clark* when it denied Cloud, Pitts, and St. Amie's petitions for habeas corpus in 2017. Nevertheless, the trial court assumed that it was not bound by that determination, which did not address Cains's role, and evaluated the evidence de novo. It stated: "[A] de novo evaluation of the evidence in this case shows beyond a reasonable doubt that each defendant involved in this matter was a major participant in carrying out Davis'[s] kidnapping and robbery and baby Jainah's kidnapping. Each defendant actively participated in a series of events during which, at each stage, threats to human life (to Davis, Spencer, and baby Jainah) were made. Defendants' actions led directly to the murder of baby Jainah. Each defendant acted with reckless indifference to Jainah's life. While the method of her death may not have been exactly as anticipated, all defendants assented to her kidnapping and to her use as security in an effort to ensure they received the requisite money from Davis. They each participated in placing baby Jainah in serious danger. As such, the death of baby Jainah was not unanticipated but rather, was an integral part of the defendants' plan if their demands were not met."

9

## DISCUSSION

I. *Relevant law*

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437) was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) To accomplish this, SB 1437 amended sections 188 and 189. (Stats. 2018, ch. 1015, §§ 2-3.) As amended, section 188 provides: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) As added by SB 1437, section 189, subdivision (e), provides: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life." (See *People v. Ramirez* (2019) 41 Cal.App.5th 923, 928.)

SB 1437 also added section 1170.95, which provides a mechanism whereby people "who believe they were convicted of murder for an act that no longer qualifies as murder following

10

the crime's redefinition in 2019[] may seek vacatur of their murder conviction and resentencing by filing a petition in the trial court." (*People v. Drayton* (2020) 47 Cal.App.5th 965, 973 (*Drayton*), overruled in part on other grounds in *People v. Lewis* (2021) 11 Cal.5th 952, 962 (*Lewis*).)

In order to obtain resentencing relief, the petitioner must file a facially sufficient section 1170.95 petition. (§ 1170.95, subds. (a)(1)-(3), (b)(1)(A).) If a petitioner does so, then the trial court proceeds to section 1170.95, subdivision (c), to assess whether the petitioner has made a prima facia showing for relief, thereby meriting an evidentiary hearing. (*Lewis, supra,* 11 Cal.5th at p. 957.) When making this determination, "the trial court should assume all facts stated in the section 1170.95 petition are true. [Citation.] The trial court should not evaluate the credibility of the petition's assertions, but it need not credit factual assertions that are untrue as a matter of law . . . . [I]f the record 'contain[s] facts refuting the allegations made in the petition . . . the court is justified in making a credibility determination adverse to the petitioner.' [Citation.] However, this authority to make determinations without conducting an evidentiary hearing . . . is limited to readily ascertainable facts from the record (such as the crime of conviction), rather than factfinding involving the weighing of evidence or the exercise of discretion (such as determining whether the petitioner showed reckless indifference to human life in the commission of the crime)." (*Drayton, supra,* 47 Cal.App.5th at p. 980; see also *Lewis, supra,* pp. 970–971.) In other words, a defendant is ineligible for relief only where the record conclusively shows that the jury actually relied—and the defendant's murder conviction

11

actually rests—upon a theory of liability that is unaffected by section 1170.95.

If the trial court determines that the petitioner has made a prima facie showing of entitlement to relief, it must issue an order to show cause and hold an evidentiary hearing. (§ 1170.95, subd. (c).) At the evidentiary hearing, the parties may rely upon evidence in the record of conviction or new evidence to demonstrate whether the petitioner is eligible for resentencing. (§ 1170.95, subd. (d)(3).) The prosecution bears the burden of proving, "beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).) If the prosecution cannot meet its burden, and the petitioner prevails, he is entitled to vacatur of the murder conviction and resentencing as set forth in section 1170.95, subdivision (e).

II. *The trial court properly denied defendants' petitions for resentencing*

A. Defendants were ineligible for section 1170.95 relief as a matter of law

As pointed out by the People, the trial court could have denied defendants' petitions at the prima facie stage.[2] The jury

---

[2] For this reason, Cains's argument set forth in his supplemental brief filed January 7, 2022, and Cloud's argument set forth in his supplemental brief filed January 19, 2022, that the trial court erred in relying upon our prior appellate decision and other inadmissible evidence to deny his petition for resentencing at the evidentiary hearing does not compel reversal. Regardless of whether they are correct on that point, the trial court certainly could rely upon *People v. Cloud*, *supra*, B109271 at the prima facie stage. After all, when enacting the amendments to section 1170.95, the Legislature specifically noted that its amendments were intended to codify the holding of

12

was instructed that to convict defendants of the special circumstances alleged under section 190.2, subdivision (a)(17), it had to find that the defendant was the actual killer, or that he aided and abetted murder with intent to kill, or that he aided and abetted the underlying felonies that led to the victim's death while acting as major participants with reckless indifference to human life.  Thereafter, the jury found true the robbery-murder and kidnapping murder special circumstance allegations. (§ 190.2, subds. (a)(17)(A) & (B).)  By finding these special circumstance allegations true, "the jury [made] precisely the same finding it must make in order to convict a defendant of felony murder under the new law." (*People v. Galvan* (2020) 52 Cal.App.5th 1134, 1141, review granted Oct. 14, 2020, S264284; see also *People v. Allison* (2020) 55 Cal.App.5th 449, 457, review denied ["the special circumstance admission shows as a matter of law that [the defendant] *could* still be convicted of felony murder even under the newly amended version of section 189, and prevents [the defendant] from making a prima facie case that he is eligible for resentencing"].)

---

*Lewis*, *supra*, 11 Cal.5th 952 "regarding . . . the standard for determining the existence of a prima facie case." (Sen. Bill No. 775 (2021-2022 Reg. Sess.) Stats. 2021, ch. 551, § 1, subd. (c).) And *Lewis* held that the trial court could rely upon the record of conviction, including a prior appellate opinion, in assessing whether a petitioner has made a prima facie case for relief under section 1170.95, subdivision (c). (*Lewis*, *supra*, at pp. 971–972.) As for the other challenged evidence, it was not used by either the trial court or us in assessing whether defendants made a prima facie case for resentencing relief.

Relying on *People v. Torres* (2020) 46 Cal.App.5th 1168, review granted June 24, 2020, S262011, *People v. Smith* (2020) 49 Cal.App.5th 85, review granted July 22, 2020, S262835, *People v. York* (2020) 54 Cal.App.5th 250, review granted November 18, 2020, S264954, and *People v. Harris* (2021) 60 Cal.App.5th 939, review granted April 28, 2021, S267802, defendants argue that their felony murder special circumstance convictions do not establish that they were major participants in the robbery and kidnapping who acted with reckless indifference to human life because their convictions predated *Banks*, *supra*, 61 Cal.4th at page 788 and *Clark*, *supra*, 63 Cal.4th at page 522. We disagree. The jury's special circumstance findings are supported by substantial evidence through the prism of *Banks*, *supra*, at page 788 and *Clark*, *supra*, at page 522.

Under *Banks* and *Clark*, a "'major participant'" in a robbery is someone whose "personal involvement" is "substantial"; such a participant "need not be the ringleader," but his involvement must be "greater than the actions of an ordinary aider and abettor." (*Banks*, *supra*, 61 Cal.4th at pp. 801–802; *People v. Williams* (2015) 61 Cal.4th 1244, 1281.) Courts are to examine the totality of the circumstances when evaluating the extent of participation including several factors our Supreme Court identified in *Banks* as relevant but not dispositive on the issue: (1) the defendant/aider and abettor's role in planning the robbery; (2) his role in supplying or using lethal weapons; (3) his awareness of the "particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants"; (4) his presence at the scene of the killing and thus whether he was "in a position to facilitate or prevent the actual

14

murder"; and (5) his actions after the use of lethal force.  (*Banks*, *supra,* at p. 803; *Clark*, *supra,* 63 Cal.4th at p. 611.)

Furthermore, a defendant acts with reckless indifference to human life when he """knowingly engag[es] in criminal activities known to carry a grave risk of death.""" (*Banks*, *supra*, 61 Cal.4th at p. 801.)  This standard "has a subjective and an objective" component.  (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)  To satisfy the subjective component, "'[t]he defendant must be aware of and willingly involved in the violent manner in which the [underlying felony] is committed,' and . . . must consciously disregard 'the significant risk of death his or her actions create.'" (*Ibid*.)  The key is whether the defendant evinces "a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.)  To satisfy the objective component, the risk of death """must be of such a nature and degree that, considering the nature and purpose of the [defendant's] conduct and the circumstances known to him[], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the [defendant's] situation.""" (*Scoggins*, *supra,* at p. 677.)

Our Supreme Court has identified a number of considerations bearing on whether a defendant has acted with reckless indifference to human life.  "No one of these considerations is necessary, nor is any one of them necessarily sufficient" (*Banks*, *supra*, 61 Cal.4th at p. 803); what matters is the totality of the considerations (*Scoggins*, *supra*, 9 Cal.5th at p. 677).  Some of these considerations include:  (1) "Was the defendant physically present at the crime," such that he had (2) "the opportunity to restrain the crime or aid the victim?";

15

(3) "What was the duration of the interaction between the perpetrators of the [underlying] felony and the victims?"; (4) "What was the defendant's knowledge of . . . [his] confederate's propensity for violence or likelihood of using lethal force?"; and (5) "What efforts did the defendant make to minimize the risks of violence during the felony?" (*Ibid.*)

As summarized in our prior opinion, and as set forth below, each defendant was an active participant in the robbery and kidnappings. This evidence overwhelmingly demonstrates, even under the heightened standard set forth in *Banks* and *Clark*, that defendants were major participants in the crimes who acted with reckless indifference to human life. Thus, relief under section 1170.95 is unavailable as a matter of law. We could affirm the trial court's orders on this basis. (*People v. Turner* (2020) 10 Cal.5th 786, 807 [a ruling must be upheld on appeal if supported by any legally correct theory].)

### 1. *Pitts*[3]

Pitts sat in his Chevrolet while the other defendants and Sudduth robbed Davis using a sharp object, beat Davis, and dragged Davis to his Datsun. When Cains and Cloud got into Pitts's car and told him to follow the Datsun, they told him it was so that Davis could get his money. Pitts remained in his car when the group stopped at Davis's old residence, and then he again followed the Datsun to the Inglewood residence of Davis's girlfriend, Spencer. Davis was in the Datsun with a pillowcase over his head both times that Pitts followed the Datsun. Pitts again remained in his Chevrolet while the others went into

---

[3] Pitts did not challenge the sufficiency of the evidence supporting the special circumstance findings in the direct appeal.

16

Spencer's residence. After Davis and his seven-month-old baby, Jainah, got into the Datsun, both cars left Spencer's residence and stopped at a gas station so that Pitts could get gas. At the gas station, Sudduth and Cloud said that they were going to Lancaster to get money and that they were keeping the baby as security.

Pitts followed the Datsun to Lancaster, where both cars stopped behind a bowling alley. Pitts stayed in his Chevrolet until the others were done talking, after which Jainah was placed unrestrained in the back seat of the Chevrolet. Along with the Datsun, Pitts drove the Chevrolet to the house of Davis's mother, Thompson.

Jainah, Pitts, St. Amie, and Cloud remained in the Chevrolet, which was parked nearby Thompson's house, while Davis, Sudduth, and Cains entered the house. When an unmarked sheriff's vehicle drove by the Chevrolet, all three men in the car ducked. Pitts complied with Cloud's order to follow the unmarked vehicle and they came upon a gathering of marked sheriff's vehicles at a nearby intersection. Pitts panicked, drove away, and crashed into a center divider. Pitts initially got out of the car and walked toward the sheriff's deputies, but he suddenly complied with orders from Cloud and St. Amie to get back in the car and drive away. He sped away with Jainah lying unsecured between Cloud and St. Amie.

Pitts drove 70 to 80 miles per hour on Lancaster city streets, speeding through stop signs and traffic lights as the sheriff's deputies chased them. He increased the speed to 100 to 120 miles per hour after leaving Lancaster. Pitts then turned the car headlights off in an area that was already dark, causing the deputies to back off. He weaved the car side to side while

17

intermittently turning on the headlights until the car hit a dip in the road, went airborne for a long distance, and crashed. Jainah died from injuries caused by the crash.

Application of the *Banks* and *Clark* factors to these facts makes clear that Pitts was a major participant in the underlying felonies who acted with reckless indifference to human life.[4] As for the *Banks* factors, although Pitts waited in his car during the planning meeting the other defendants had with Sudduth, Pitts was well-aware of the dangers posed by the prolonged effort to extract money from Davis. He twice followed the Datsun while Davis had a pillowcase over his head. Pitts also allowed Jainah, a seven-month-old baby, to be placed unrestrained in the back of his car after Cloud said at the gas station that Jainah was being held as security for Davis's money. Further, Pitts twice tried to flee from sheriff's deputies in his car—the second time at illegal and unsafe speeds—while Jainah was unprotected in the back seat. The danger of driving a baby, who cannot protect herself, without any restraints, particularly at high speeds, is obvious. Pitts heightened that danger by turning off the headlights and swerving, ultimately leading to his second crash of the night with Jainah in the car. Thus, Pitts was not only aware of the dangers, but was also directly responsible for what led to Jainah's death. His highly unsafe driving, in an effort to escape from law enforcement, facilitated the murder.

With regard to the *Clark* factors, it is unclear if Pitts knew that Davis was robbed with a sharp object and that Sudduth had a gun. However, Pitts was nearby throughout every stage of this prolonged, multistep effort to extract money from Davis. He was

---

[4]    Pitts was convicted of kidnapping for ransom and first degree robbery.

18

in his Chevrolet nearby every stop, and outside Thompson's house, he acted as a lookout along with St. Amie and Cloud. The kidnapping victim, Jainah, was also in Pitts's car from the time of the bowling alley meeting to the time of her death. Pitts was clearly proximate to the underlying robbery and kidnapping. Moreover, he did absolutely nothing to minimize the possibility of violence. He acceded to every order made by his companions, including allowing a baby to be placed unrestrained in his car and getting back into his car to flee from sheriff's deputies at high speeds. Indeed, in our prior opinion, we found "nothing in the record to suggest that any of the orders given" to Pitts "constituted threats of harm to [him] or that Pitts so perceived them." (*People v. Cloud, supra,* B109271, at pp. 20–21.) We noted that Pitts "made no effort to leave his companions" and that there was "nothing to suggest that he could not surrender to the police, rather than reentering the car after crashing into the center divider." (*People v. Cloud, supra,* at p. 20.)

Pitts drove the fleeing car that crashed and killed Jainah. His conduct meets the *Banks* and *Clark* factors to show that he was a major participant who acted with reckless disregard for Jainah's life.

### 2. *St. Amie*

Unlike Pitts, St. Amie was not off and waiting in the Chevrolet. He was present, along with Cloud and Cains, when Sudduth robbed Davis by putting a knife or screwdriver against Davis's abdomen. St. Amie, with Cains, also dragged Davis and put him in the Datsun while Davis's head was covered with a pillowcase. St. Amie joined Sudduth and Davis in the Datsun as they proceeded to Davis's former residence, during which Sudduth threatened to kill Davis if he did not give Sudduth all of

19

his money.  Once at Davis's former residence, St. Amie went with Sudduth, Davis, Cloud, and Cains to the alley behind the residence.  In the alley, Sudduth pointed a revolver at Davis and again threatened to kill him unless he led them to his money.  When Davis suggested going to his girlfriend's house to look for money, a pillowcase was again placed over his head while St. Amie, Cloud, and Cains were present.  While St. Amie was again in the car with Sudduth and Davis, Sudduth repeatedly threatened to kill Davis if he failed to get the money he promised.

When the two cars arrived at Spencer's house, St. Amie went inside the house with Sudduth, Davis, and Cains.  Cloud came in shortly thereafter.  While St. Amie was inside the house, Sudduth forced Spencer to get on her knees and threated to kill her and her children.  Sudduth made the same threats again while holding a knife to her throat and subsequently pointing a gun at her head.  Sudduth then forced Davis to the ground, pointed the gun at his head, cocked the gun, and threatened to kill him.  Davis said he could get money from his mother's house in Lancaster.  Sudduth ordered Davis to bring Jainah with them, and "[t]he men" told Spencer that they would kill Jainah and Davis if Davis failed to get them money.

St. Amie got into the Datsun with Sudduth, Davis, and baby Jainah.  When they and those in Pitts's Chevrolet stopped at the bowling alley in Lancaster, St. Amie was part of the group that discussed the plan for when they got to Thompson's house.  St. Amie and the others agreed that some would stay outside with the baby in the Chevrolet—as security to prevent someone from calling the police—while the others entered the house.  St. Amie placed Jainah in the Chevrolet's backseat, unsecured.

20

Once they got to Thompson's house, St. Amie sat in the Chevrolet's backseat with Jainah lying unrestrained between him and Cloud. After Pitts followed the unmarked sheriff's deputy car and crashed the Chevrolet, he got out of the Chevrolet and began walking toward the sheriff's deputies. But St. Amie and Cloud yelled at Pitts and demanded that he return to the car. Specifically, they told him, "'Let's get the Hell out of here. This is my life,'" as well as, "'Get your ass back in the car and drive. This is our life.'" . . . "What's wrong with you?" . . . "Drive. Drive. Drive the mother fucking car. Drive.'"" After Pitts returned to the Chevrolet and began driving away, St. Amie and Cloud continued yelling at him to drive. St. Amie was in the car during Pitts's highspeed efforts to escape law enforcement and when the car ultimately crashed, killing Jainah.

Applying the *Banks* and *Clark* factors to these facts makes clear that St. Amie was a major participant in the underlying felonies who acted with reckless indifference to human life.[5] St. Amie may not have driven the car that killed Jainah, but he was involved in nearly every decision leading up to that fateful moment. Thus, his claim that the "crime could have continued without him" is simply untenable.

St. Amie claims that he had no control over Pitts. The evidence proves otherwise. He could have let Pitts surrender to sheriff's deputies; instead, he ordered Pitts to get back to the car and flee. The fact that St. Amie ordered Pitts back into the car to "get the Hell out of here", completely undercuts his claim that he

---

[5] St. Amie was convicted of second degree robbery, kidnapping for robbery, kidnapping for ransom, attempted first degree robbery, and first degree robbery.

was unaware of Pitts's "unplanned decision to enter the car and drive recklessly." Further, Jainah was lying next to St. Amie in the car, yet he did nothing to secure the baby before or during an inherently dangerous highspeed car chase. St. Amie's willingness to use a baby as security to get money and his failure to secure her in any way in the Chevrolet led directly to Jainah's death.

St. Amie had multiple missed opportunities to stop the series of events leading up to Jainah's death. His conduct meets the *Banks* and *Clark* factors to show that he was a major participant who acted with reckless disregard for Jainah's life.

### 3. *Cloud*

Like St. Amie, Cloud was involved in every stage of the multiple crimes committed to extract money from Davis. In addition, Cloud engaged in further actions that demonstrate his reckless disregard for Jainah's life.

When the group initially encountered Davis and Sudduth used a sharp object to rob him, Cloud held Davis as a pillowcase was put over his head and Davis was subsequently beaten by several people. After Davis was first put in the Datsun, Pitts asked Cloud why he should follow the Datsun, to which Cloud replied that it was so Davis could get money.

While inside Spencer's residence, Cloud got a knife from the kitchen and gave it to Sudduth, who subsequently held the knife to Spencer's throat and threatened to kill her and her children. Cloud left Spencer's house holding a gun. When Pitts needed to get gas, Cloud and Sudduth said that they were going to keep Jainah as security until they got the money Davis promised in Lancaster. And when the group discussed the plan at the bowling alley in Lancaster, Cloud said that Jainah would be returned only when they got the money. And, as set forth

22

above, Cloud was in the backseat of the Chevrolet while Jainah was unsecured and ordered Pitts to return to the car when Pitts tried surrendering to sheriff's deputies.

As with St. Amie, application of the *Banks* and *Clark* factors to these facts makes clear that Cloud was a major participant in the underlying felonies who acted with reckless indifference to human life.[6] Not only did he engage in conduct nearly identical to that of St. Amie, he gave Sudduth the knife used to threaten Spencer at her house and he held a gun in his hand when the group left Spencer's house. This conduct demonstrates Cloud's encouragement and aiding in the increased possibility of violence. Furthermore, Cloud appeared to have a pivotal role in the planning of the crimes as he was the one who told Pitts to follow the Datsun, who told everyone at the gas station why they were going to Lancaster, and who told everyone at the bowling alley that Jainah would be returned when they got their money.

Notably, contrary to Cloud's assertion, Cloud did nothing to reduce the obvious grave risk to life of having a baby unsecured in a car during a highspeed chase. Indeed, as we stated in our prior opinion, Cloud and St. Amie "instigated and encouraged the car chase that resulted in the baby's death." (*People v. Cloud, supra,* B109271, at p. 16.) Cloud even admits "death was a possible outcome for anyone in the speeding car," but baselessly speculates that the risk to the life of a helpless and unsecured baby in such a car was not grave.

---

[6] Cloud was convicted of second degree robbery, kidnapping for robbery, kidnapping for ransom, attempted first degree robbery, and first degree robbery.

23

In sum, Cloud was well-aware that he and his companions were using a baby as leverage to get money from Davis, and he was actively involved in the series of events leading up to Jainah's death. Thus, his conduct meets the *Banks* and *Clark* factors to show that he was a major participant who acted with reckless disregard for Jainah's life.

### 4. *Cains*

Like St. Amie and Cloud, Cains was involved in every stage of the multiple crimes committed to extract money from Davis. To the extent his conduct was similar to that of St. Amie and Cloud, for the reasons set forth above, it demonstrates his reckless disregard for human life. But Cains engaged in additional abhorrent behavior.

Cains was present when Sudduth used a sharp object to rob Davis and when Davis was beat by several people. Cains helped St. Amie drag Davis to the Datsun while Davis's head was covered with a pillowcase. While at Spencer's residence, Cains stood guard at the door to prevent Spencer's children from escaping while Sudduth threatened (with a knife and a gun) to kill both Spencer and Davis. Cains was part of the group at the bowling alley that discussed and decided the plan to hold Jainah outside as security against someone calling the police.

Admittedly Cains was not in the Chevrolet with Jainah when the car crashed. Instead, he went into Thompson's house with Sudduth and Davis. Sudduth waved a gun as they entered the home and told Thompson's daughter to end her phone call (which was to the sheriff's department). Cains and Sudduth demanded money and guns, and Sudduth again threatened to kill Davis. After Davis took money from Thompson and handed it to Cains and Sudduth, they demanded more money and "handed the

24

gun back and forth between them." Sudduth told Thompson that he would kill Jainah if Thompson did not give him money or if he saw a police car. When Cains and Sudduth heard sheriff's deputies yelling at the other three individuals in the Chevrolet, they ran out of Thompson's house and fled. Cains was arrested several months later that year in Indiana.

Application of the *Banks* and *Clark* factors to these facts makes clear that Cains was a major participant in the underlying felonies who acted with reckless indifference to human life.[7]

Urging us to reverse, Cains minimizes his role by placing blame on Sudduth and Pitts. He contends that "there was no evidence [he] knew his own actions[] involved a grave risk of death." (Bolding omitted.) This contention is untenable. As with St. Amie and Cloud, Cains was involved at every stage of the planning of these crimes. He helped initiate the kidnapping of Davis by helping St. Amie drag Davis with a pillowcase over his head to the Datsun. He was in the alley when Sudduth used a gun to threaten Davis's life if Davis did not pay up. He stood guard at Spencer's house.

And, he participated in the planning meeting at the bowling alley before going to Thompson's house, during which Cains, Sudduth, Cloud, and St. Amie agreed to keep Jainah as leverage to ensure that Thompson gave them money, thus negating the speculative assertions Cains never "talked about taking" Jainah and that he "played [no] role in the decision to take" Jainah. Cains was well-aware of the reason for taking Jainah. He willingly participated in a scheme to take Davis's

---

[7] Cloud was convicted of second degree robbery, kidnapping for robbery, kidnapping for ransom, attempted first degree robbery, and first degree robbery.

25

baby to force him to comply with their demands for money, and in doing so Cains did nothing to minimize the possibility of violence.

The fact that he went with Sudduth inside Thompson's house rather than waiting in the Chevrolet with Jainah does not make him any less responsible for Jainah's death. He was present when Sudduth threatened Davis and Spencer. He was involved in the taking of Jainah and the plan to use her as security while robbing Thompson. Despite his argument otherwise, Cains was not "mere[ly] present;" he actively helped execute the plan.

The argument that he was unaware that his actions involved a grave risk of death is absurd. He was part of an armed group that took a baby, put the baby in a car unsecured, and told their victims the baby would be killed unless they got their money. Regardless of how Jainah was killed, there was ample evidence that Cains was aware of the fatal risks facing a kidnapped baby. He may not have been in the car when Jainah died, but his involvement in the planning and execution of that plan set in motion the series of events leading to the baby's death. Cains did nothing to prevent the baby's murder; rather, his actions facilitated it.

Finally, Cains fled to another state after the murder occurred and was not arrested until months later.

Taken together, this conduct meets the *Banks* and *Clark* factors to show that Cains was a major participant who acted with reckless disregard for Jainah's life.

B.  <u>After the evidentiary hearing, the trial court determined beyond a reasonable doubt that defendants were guilty of murder under current law</u>

The trial court properly denied each defendant's petition for resentencing because, after the evidentiary hearing, the trial court acted as an independent factfinder and determined, beyond a reasonable doubt, that defendants were guilty of murder under current law.  (*People v. Lopez* (2020) 56 Cal.App.5th 936, review granted Feb. 10, 2021, S265974; *People v. Rodriguez* (2020) 58 Cal.App.5th 227, review granted Mar. 10, 2021, S266652; *People v. Clements* (2021) 60 Cal.App.5th 597, 617–618, review granted Apr. 28, 2021, S267624; *People v. Duchine* (2021) 60 Cal.App.5th 798, 813–814.)  In so ruing, the trial court expressly noted that it was "very familiar with the facts" of the case and that it had "spent an inordinate amount of time on this case and dissecting each and every participant's role and conduct."[8]  And, as set forth above, the trial court's findings that each defendant was a major participant in carrying out Davis's kidnapping and robbery and Jainah's kidnapping are supported by substantial evidence, including the undisputed facts set forth in our prior opinion.[9]  (See, e.g., *People v. Clements*, *supra*, 60 Cal.App.5th at p. 618; *People v. Lopez*, *supra*, 56 Cal.App.5th at p. 953.)

---

[8]  Contrary to the arguments raised in the supplemental briefs, these comments suggest that the trial court did not simply rely upon our prior appellate opinion when it denied defendants' petitions for resentencing.

[9]  In their supplemental brief, Cains and Cloud argue that the trial court erred in relying upon the facts set forth in our prior opinion at the evidentiary hearing.  But, as the trial court

We reject Cains's request for a new evidentiary hearing. Neither he nor any other defendant presented any new evidence, and the facts were undisputed for the purpose of resolving defendants' petitions for resentencing. Under these circumstances, and after the trial court's thorough review of the record, no remand is necessary.

**DISPOSITION**

The orders denying defendants' section 1170.95 petitions are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
HOFFSTADT

---

specifically noted, those facts were undisputed. Any challenge to them now has been forfeited.